## METRO NATIONAL CORPORATION, Plaintiff,

v.

## DUNHAM–BUSH, INC., Defendant.

### No. CIV.A. H–94–2808.

United States District Court,
S.D. Texas,
Houston Division.

Aug. 20, 1997.

Defendants' reliance on it is misplaced.

J. Christopher Reynolds, Jean C. Frizzell, Gibbs & Bruns, Houston, TX, for plaintiff.

Bradley Westmoreland, Westmoreland and Crain, Houston, TX, for defendant.

### *OPINION*

ATLAS, District Judge.

### *INTRODUCTION*

Plaintiff Metro National Corporation ("Metro") brought this action against Defendant Dunham–Bush, Inc. ("Dunham–Bush") for fraud and breach of warranty in connection with Defendant's sale of compressors for use in Plaintiff's thermal storage air conditioning system.[1] On October 16, 1996, this Court issued a Memorandum and Order ("Order") [Doc. # 59] denying Dunham–Bush's Motion for Summary Judgment. After considering the evidence presented at a five day bench trial, the Court now holds that Dunham–Bush is liable to Metro for fraud in inducing Metro to enter a contract for the purchase of unsuitable products and for breach of warranties. Metro is entitled to recover damages that were incurred as a result of its reasonable reliance upon Dunham–Bush's fraudulent representations and warranties, as set forth in Part III.C. below.

### I. *FINDINGS OF FACT* [2]

#### A. *Background*

In the late 1980s, Plaintiff Metro, owner of Memorial City Medical Center, wanted to

---

**1.** Plaintiff also asserted a cause of action for negligent misrepresentation but withdrew it during trial in acknowledgment that this claim is barred by the applicable statute of limitations.

**2.** To the extent necessary, all findings of fact that

lower its utility costs. After investigating various alternatives, Metro determined that it would construct a thermal energy storage system to replace its conventional air conditioning system. A thermal energy storage system allows a consumer of electricity to shift its need for electricity from peak (weekday, daytime) to off-peak (weekend and night-time) hours. In the case of the system in issue, the thermal energy storage system accomplished this shift by using electric energy to make ice during off-peak hours. The system stored the ice, and then, during peak hours, allowed the ice to melt, and circulated the resulting cold air or water throughout Metro's facilities to provide air conditioning and other cooling services.

By using a thermal energy storage system, Metro expected to receive a substantial discount from Houston Lighting and Power Co. ("HL & P") for its electricity costs. In the years in issue in this case, HL & P offered discounts for thermal energy storage customers because these customers assisted HL & P in lowering electricity demand during peak hours. Under HL & P's pricing scheme, a thermal energy storage customer had to commit not to use, and in fact not use, HL & P's electricity during peak hours for an entire calendar month in order to receive a discount for that month. If the customer used electricity during any peak hours, all electricity for the entire month was charged at a premium rate. Thus, when Metro subscribed to the HL & P thermal energy storage program, its goal was to eliminate all its demand for HL & P–generated electricity during peak hours.

After considering various proposals and with the assistance of engineering consultants, Metro decided to construct a thermal storage system using, as its centerpiece, ice harvesters (large, industrial ice making machines) manufactured by Morris & Associates, Inc. ("Morris"). Because Metro designed its thermal storage system specifically around the Morris ice harvesters, the system's success depended upon the performance of those units. If the ice harvesters failed, the entire thermal energy system was inoperable. Because of the unique operation and physical configuration of Morris's equipment, the Morris ice harvesters could not be manufactured or replaced by another company.[3]

### B. Dunham–Bush's Role in the Thermal Storage System

The critical component of any ice harvester is its refrigerant compressor. The Morris ice harvesters used compressors manufactured by Defendant Dunham–Bush. Morris, an experienced designer of ice making and industrial refrigeration equipment, recommended the Dunham–Bush compressors for its ice harvesters based on Morris's engineering evaluations and testing, as well as on Dunham–Bush's representations of its compressors' reliability and suitability for the Morris ice harvesters.[4]

As early as 1988, Dunham–Bush had entered discussions with Morris to supply compressors for Morris's ice harvester product line. Prior to Morris's approaching Metro, Dunham–Bush had recognized thermal storage to be a valuable new market for its compressors and was working with Morris to design and provide a compressor specifically for use in the Morris ice harvester. In 1988

are labeled herein as conclusions of law should also be considered findings of fact, and all conclusions of law that are labeled findings of fact should be considered conclusions of law. These findings and conclusions are based on a detailed consideration of the parties' evidence (testimony and exhibits). The Court refers to exhibits in the record only by way of illustration as to the source of referenced information.

**3.** At trial, Metro demonstrated that the design of the Morris ice harvester system was significantly different from other proposed systems, which would have been manufactured by other companies, by presenting comparisons of cost and design plans that Metro's representatives examined

when Metro was deciding which system to construct. For example, Metro's pre-purchase analysis, Plaintiffs Exhibit ("PX") 113, shows that the Morris system was significantly different from another proposed system whose key components were manufactured by Trane Corporation. The design differences were reflected in the costs of the various components of each system.

**4.** Morris previously used compressors, manufactured by other companies, Vilter and Carrier, but had redesigned its ice harvesters to use the Dunham–Bush vertical screw compressors in order to achieve cost and space savings. See PX 78.

or 1989, Dunham–Bush developed the 1216 vertical screw compressor that became known as the 1216SE model; the 1216SE was used solely for the Morris ice harvester.

The 1216SE compressor was not a standard "off-the-shelf" compressor. Rather, Dunham–Bush actively assisted in the design and engineering of the Morris ice harvesters to enable the ice harvesters to use Dunham–Bush compressors and, eventually, the Dunham–Bush model 1216SE specifically. Starting in or about 1988, while the ice harvesters were being developed, Dunham–Bush worked closely with Morris to adjust the design of the compressor models, labeled "1215" and then "1216," to fit Morris's product. Later, Dunham–Bush created the 1216SE [5] compressor for Morris's ice harvesters.

Dunham–Bush also played an important role in marketing the Morris ice harvester system. Dunham–Bush repeatedly provided and edited promotional materials for Morris to use in marketing, reviewed job proposals, met with potential and existing end-user customers upon request, and responded to customer concerns before and after their ice harvester purchases. Dunham–Bush's witnesses acknowledged and the company indicated in its marketing materials that the company "approved" the Morris ice harvester as a suitable application for its 1216SE compressors. As a culmination of its marketing efforts, Dunham–Bush extended free of charge a "full five-year warranty (parts and labor)" for its 1216SE compressors, instead of the company's usual twelve month warranty. In a letter Dunham–Bush sent to Morris, Dunham–Bush acknowledged that it intended for this five-year warranty to assist in Dunham–Bush and Morris's "joint effort to push into the thermal storage market."

Dunham–Bush was aware that, in order to function properly, the Morris ice harvesters, equipped with Dunham–Bush's compressors, would need to be installed with other specialized equipment such as tanks, special piping, and unique controls. In addition, Dunham–Bush was aware of the unique nature of the Morris design and wanted to be associated with that design as the manufacturer of the compressor of choice in order to enhance its potential sales.

## C. Dunham–Bush's Representations and Warranties Regarding its Compressors

Dunham–Bush maintains that it only made representations regarding its compressors to Morris and should not be held liable directly to Metro for any problems Metro later experienced with the compressors. After carefully examining the evidence presented at trial, the Court finds that, when Metro was first selecting a thermal storage system, Dunham–Bush made representations to Metro *through Morris*, on which Metro reasonably relied, regarding the reliability, suitability, and capacity of its compressors. Later, after Metro's initial purchase of Morris ice harvesters, when Metro was deciding whether to continue working with its Morris ice harvester system, Dunham–Bush made similar representations *directly* to Metro.

First, with respect to Dunham–Bush's representations to Metro through Morris, Dunham–Bush assured Morris in 1989 and in 1990 that the 1216SE compressors were specially designed, reliable, and suitable for use in the Morris ice harvesters and would perform as predicted under field conditions that were expected to exist in an installed Morris ice harvester. More specifically, Dunham–Bush also provided detailed capacity ratings, design and engineering information, as well as reliability data, for Morris to include in its promotional materials. These materials indicated that Dunham–Bush's compressors experienced only a 3% failure rate during the first year and a 10% failure rate during the first ten years of operation. Testimony established that these figures applied to the industry average, Dunham–Bush's goal, and Dunham–Bush's actual results for its compressors generally in and before 1990. Finally, Dunham–Bush agreed to give an extended warranty, five years rather than one year, on its 1216SE compressors in order to demonstrate its commitment to the ice harvesters.[6]

Dunham–Bush intended for Morris, as part of Morris's marketing efforts, to com-

---

**5.** "SE" meant "specially engineered."

**6.** Also, the parties' pre-purchase discussions covered Dunham–Bush's field service operations. It appears that Dunham–Bush's local Texas service

municate these representations to potential end-users such as Metro. Morris did in fact transmit these representations to Metro prior to Metro's placing an initial order, in September 1990, of three ice harvesters, equipped with Dunham–Bush 1216SE compressors. Dunham–Bush thus led Morris and Metro to believe that compressor failure was an extremely rare occurrence and that Dunham–Bush compressors would be highly reliable when used in the Morris ice harvesters.

Second, Dunham–Bush made explicit representations directly to Metro in July and August 1991. After Metro made the first purchase in September 1990 and installed the three ice harvesters in the spring of 1991,[7] Metro experienced a compressor failure almost immediately, in May. In response to a complaint from Metro about the compressor failure, Dunham–Bush wrote to Metro on August 8, 1991, and explained that the compressors were "specially designed" for the Morris ice harvester application and that Metro's problem was "random" and "non-reoccurring."[8] Dunham–Bush also stated to

Metro in a different letter, dated July 30, 1991, that it was Dunham–Bush's goal with Morris to provide a "thermal storage package" with a "high level of reliability."[9] Following these direct representations, Metro's system did not have any compressor failures for ten months. Therefore, in June 1992, Metro ordered two additional ice harvesters.[10]

The parties dispute the extent of the Dunham–Bush warranty that was provided to Metro. The evidence is clear that Dunham–Bush expressly extended to Morris, and Morris passed along to Metro, a "full five year warranty (parts and labor)" on the 1216SE compressors.[11] The meaning of the phrase, however, is in question. Metro was aware, at a minimum, that the warranty being offered by Dunham–Bush on the compressors (originally passed through Morris) was a five year warranty, at least on *parts and labor*.

Dunham–Bush's position at trial was that, in connection with the Morris ice harvesters, Dunham–Bush intended to offer its standard limited warranty except that the ordinary one year term was extended to five years from time of installation. However, the

representatives were to be made available to provide service for local end-users.

7. Metro took delivery of the first three ice harvesters in March 1991 and installed them within the next few months.

8. PX 214; Defendant's Exhibit ("DX") 217.

9. DX 237.

10. Dunham–Bush denies that Metro relied on these representations and contends instead that the only representations on which Metro relied were "successful" certified factory tests that Morris conducted on the ice harvesters that Metro representatives witnessed. The Court rejects this contention. Although Metro did observe certain tests conducted by Morris, the evidence indicates that some of these tests were not appropriate measures of the equipment's ability to perform under actual on-site conditions, while other tests failed to address certain capabilities (*i.e.*, the chiller function) that the ice harvesters were supposed to include. The "success" of the tests was debatable. Thus, the evidence persuades the Court that even if Metro considered these test results, Metro also relied to a significant degree on Dunham–Bush's direct representations and the information Dunham–Bush provided through Morris for end-users.

11. Specifically, the paperwork preceding Metro's purchase of the first three ice harvesters contained the following:
- In the Introduction to the Morris's ice harvester proposal to Metro, Morris stated that it would provide "one (1) screw compressor/motor with five (5) year parts and labor warranty" and that the "Dunham–Bush compressor comes complete with a full 5 year replacement warranty with parts and labor included." *See* PX 135, at 1, 9 (Bates Nos. 26 and 37) ("Introduction" and "Warranty"). This description of the warranty comported with the information Morris received from Dunham–Bush. *See* PX 51.
- Metro's own written analysis comparing Morris's ice harvesters with the Trane/Calmac equipment reported that the ice harvesters had a "5 year parts and labor warranty." PX 113.
- Metro learned of Morris's ice harvesters from a proposal submitted by AC Engineered Systems, Inc., which set forth the warranty as: "Five (5) Full Year Warranty on Compressors (parts and labor)." PX 126.
- Morris's "Order Acknowledgment" sent to Metro listed the warranty as: "full 5 year warranty on parts and labor." PX 130.
- Metro's purchase order dated September 13, 1990 to Morris for the three original ice harvesters listed the warranty as "Five (5) Full Year Warranty on Compressor (Parts and Labor)." PX 139.

Court finds, based on the testimony of Dunham–Bush's engineers and sales representatives, that this "parts and labor" warranty included the promise by Dunham–Bush that its 1216SE compressor's design was suitable and reliable for use in the ice harvesters, which meant these compressors met industry and Dunham–Bush's own prior performance standards.

Because of these representations and warranties, Metro expected Dunham–Bush to produce a product that performed consistently with industry standards and expected Dunham–Bush to stand behind its product. Metro relied on the representations and warranties in purchasing the Morris ice harvesters equipped with Dunham–Bush compressors and in developing its thermal storage system around these ice harvesters. The Court's assessment of the credibility of Metro's representatives, William Huntsinger and Wayne Hays, as well as testimony of Dunham–Bush's engineers, Donald Schaefer, Joseph Querner, and Joe Orosz, considered in light of the parties' and Morris's contemporaneous documentation, compels this finding.

In addition, the Court finds that Dunham–Bush knew that end-users, including Metro, would, and intended for end-users to rely upon its representations regarding the reliability, suitability, and capacity of its 1216SE compressor and upon the extended warranty it offered on that compressor.[12] At trial, all of Dunham–Bush's representatives who testified stated that the reason for the extended warranty, and the reason why Dunham–Bush sought to have its name actively used in connection with the Morris ice harvesters, was to give end-users a "warm feeling" about the product and enhance Dunham–Bush's

reputation. Dunham–Bush's representatives stated that they were aware that, in the late 1980s, potential end-users had been questioning Dunham–Bush's products and that Dunham–Bush decided to offer a substantially longer warranty than its typical warranty in order to demonstrate that the company stood behind its product.

### D. The Compressors' Failures

Contrary to Dunham–Bush's representations, the 1216SE compressors were defectively designed for the ice harvester application, which caused them to fail at a grossly higher rate than the industry standard or than would be expected from the reliability data that Dunham–Bush had included in its promotional materials. Although Dunham–Bush had represented that only 3% of its compressors fail during their first year and only 10% fail during their first *ten* years, Metro experienced at least a 70% failure rate in the roughly two years of the system's operation. These failures were "catastrophic" failures, which meant that the compressors stopped functioning. These failures occurred in May 1991, July, October, and December 1992, and February 1993.[13] Since the compressors are self contained, hermetically sealed units, these failures meant they could not be opened at Metro's site; they needed to be returned to the manufacturer for repair or replacement.

### E. Dunham–Bush's Knowledge of the Compressors' Defects

#### 1. Dunham–Bush's Knowledge of the Defects in the Compressors' Design

Dunham–Bush knew that the representations that were passed to Metro (and other

---

**12.** *See generally* PX 35, 38, 41, 42, 51, 53, 56, 62, 67, 83, 84, 89, 100, 190.

**13.** A total of five of Metro's compressors had catastrophic failures. Another compressor began making loud, abnormal sounds during operation in early 1993 and could not be used. The first two compressors that failed appear to have been among the three compressors originally ordered in March 1990. Dunham–Bush replaced these two compressors pursuant to its warranty. The next three catastrophic failures occurred thereafter. In addition to these five catastrophic failures, another unit began to make abnormally loud noises in February 1993 and needed to be shut down, since it clearly was malfunctioning

and could not be relied on to support the thermal storage system. Metro thus had a total of seven different compressors on site, of which six failed (five, catastrophically), for a failure rate of between 71% and 85%.

It is unclear from the evidence presented at trial precisely which compressors experienced the last four failures and problems in late 1992 and early 1993. For purposes of determining whether Dunham–Bush is liable for fraud or breach of warranties, it does not matter which compressors failed, since Dunham–Bush made representations regarding, and extended the "full five year warranty" to, all of its 1216SE compressors.

end-users) through Morris and that were made directly to Metro, regarding its compressors' reliability and suitability for the Morris ice harvester system, were false at the time those representations were made. The Court bases this finding on its assessment of the credibility of the parties' witnesses and, specifically, the following evidence.

By September 1990, Dunham–Bush knew that at least six of the first seven units of the 1216SE compressor (or its predecessor, all of which were manufactured for Morris ice harvesters between August 1988 and May 1990) had failed.[14] While the Dunham–Bush engineers attributed the failures to various causes, they all related to mechanical problems. Dunham–Bush had analyzed at least three of the failed compressors by the time it received Metro's order or very shortly thereafter.[15] The evidence of record overwhelmingly indicates that Dunham–Bush knew of serious problems with compressors in the Morris ice harvester application, which, according to Dunham–Bush engineers, was placing inordinate stress on the Dunham–Bush compressors.

Internal Dunham–Bush memoranda and communications between Dunham–Bush and Morris demonstrate that, during 1989–90, the period in which Dunham–Bush was making the representations described above, Dunham–Bush was well aware of design and operational problems with the 1216SE compressor. Throughout 1989–91, if not later, Dunham–Bush continued to make alterations to the compressors' design in an effort to improve their performance and to achieve the results it had promised to Metro and

other end-users.[16] However, Dunham–Bush did not disclose to Metro, before Metro placed either of its orders, that the 1216SE compressor design was undergoing changes and thus the compressor design was still in an experimental phase.

Other evidence of Dunham–Bush's acute awareness in 1989–90 of the unusual difficulties its 1216SE compressors were experiencing was Morris's insistence (and Dunham–Bush's agreement) that Dunham–Bush keep in stock a fully constructed replacement for each model compressor Dunham–Bush sold to Morris for ice harvesters.[17] Dunham–Bush knew from Morris and from general experience that a compressor failure would shut down the ice harvesters completely, which would render the related thermal energy storage system inoperable or in serious jeopardy. By agreeing to keep replacement compressors on hand for every model of compressor it sold, Dunham–Bush thus acknowledged that the reliability data it was allowing Morris to distribute as to Dunham–Bush compressors was false.

Dunham–Bush's chief engineer and liaison for Morris, Donald Schaefer,[18] testified that, prior to the time of Metro's purchase of the ice harvesters in 1990 and 1992, he did not believe that the 1216SE compressor was a defective product. Therefore, he claimed to see no need to tell anyone about the 1216SE compressors' failures in other Morris ice harvester installations. Nor did he see a need to modify the representations Dunham–Bush had made to Morris and end-users. At trial, Schaefer nevertheless acknowledged that the

14. *See* DX 412. This chart appears to contain a typographical error; compressor # 7 is reported to have failed on "6/25/91," four months after it was "torn down" (analyzed). Most likely, the failure was on 6/25/90, months *before* the tear down, in which case Dunham–Bush's own evidence indicates that *all seven* compressors that had been installed had failed *prior to* Metro's September 1990 order.

15. Metro submitted its initial order to Morris in mid–September 1990. However, Metro did not begin its construction of the facility to house the ice harvesters and the entire thermal energy storage system until shortly after submitting its order and did not obtain delivery of the ice harvesters

until six or more months later. Thus, what Dunham–Bush knew about its compressors' defects even several weeks after Metro placed its order to Morris is material to Dunham–Bush's liability.

16. *See, e.g.,* PX 169, 183.

17. *See, e.g.,* PX 73, 75, 77, 84, 101, 102.

18. Schaefer was the senior engineer overseeing the coordination between Dunham–Bush and Morris to design a Dunham–Bush compressor for the Morris ice harvester application. It appears that Schaefer was appointed to be Dunham–Bush's contact person for Morris in or about 1989.

1216SE model experienced a remarkably high failure rate.

The Court finds that the negative failure rate information was known to Schaefer and to marketing and sales representatives at Dunham–Bush in as early as mid–1990.[19] However, Schaefer and other Dunham–Bush engineers simply downplayed or ignored the significance of this information. Moreover, Dunham–Bush failed to disclose to end-users that the design of the 1216SE was in flux or that the predicted 3%/10% failure rates had not actually been obtained with the 1216SE. Instead, Dunham–Bush chose to rely on its old, outdated materials in order to promote the compressors in the hopes of achieving increased sales.

In September 1990 Dunham–Bush engineers performed a statistical analysis of failures on almost all Dunham–Bush compressor models and issued a report.[20] All 1216 models were grouped together in the analysis, despite their significantly different applications. There was no report of the performance of the 1216SEs. However, the performance of the 1216SEs had been so poor by this time that the Court finds it incredible that Dunham–Bush was unaware of these results.

Schaefer and others at Dunham–Bush knew that Dunham–Bush was intimately involved with Morris in creating the ice harvesters. The 1216SE compressor was still in development and had not been previously successfully operated for any substantial length of time at an end-user's facility. Given that the 1216SE compressor was a new version of Dunham–Bush's products heavily promoted by Morris, and given that Dunham–Bush was lending its name, its product, its information, and its explicit approval of the use of its compressors in the ice harvesters, the Court finds that the only reason Dunham–Bush failed to perform a written analysis of the compressor's on-site success rate is that Dunham–Bush intentionally chose not to publish such data, despite Dunham–Bush's awareness of the compressors' failures.

Moreover, by the time Metro's first ice harvesters were delivered to Morris and installed at Metro's facility in the spring of 1991, Dunham–Bush knew that the number of 1216SE compressors with operating problems was not only serious, but unprecedented. By this time, nine compressors out of the first eighteen 1216SE compressors installed in Morris ice harvester systems had failed and these failures often were within a year of installation.[21] Dunham–Bush's engineers knew of various design problems in the compressors at or prior to this time, since they were involved in "tearing down" many of the failed compressors and preparing reports analyzing the causes of the failures.[22]

---

**19.** Schaefer and others were aware of problems with the 1216SE compressors in tests and early field operations. For instance, the engineers and sales representatives were handling problems arising at Morris's ice harvester installations equipped with precursors to the 1216SE compressor in Biloxi, Mississippi, and in another installation, referred to as the "Gibson Tower" installation. The Court does not credit Schaefer's testimony that he was unaware of the falsity of the reliability and suitability information that Dunham–Bush included in the materials used by Morris to promote the ice harvesters.

**20.** PX 144. However, Schaefer contends that, in this analysis, he did not take note of the 1216SE compressor in particular. Schaefer stated he spent only 5% of his time on Morris–related matters. However, he acknowledged that the failure rate of the 1216SE compressor was very significant. Thus, the volume of time spent is not dispositive of the importance of the information he received or his recollection or awareness of it in 1990. At trial, Schaefer could not explain

all the data in this report. The Court gives little weight to his denials concerning Dunham–Bush's knowledge of the fate of the 1216SE compressors.

**21.** *See, e.g.,* DX 412, PX 29B. The evidence is unclear as to how many 1216SE compressors were in operation out of the twenty-five manufactured by that time. There is no data on the start-up or exact failure date on at least nine of these compressors.

**22.** The "tear down" reports revealed that in many instances the problem stemmed from inadequate lubrication, valve malfunctioning, or a seizure (metal hit metal in a crucial part of the compressor). These problems indicated that components within the compressors were not made within the appropriate design tolerances or were not operating properly under the conditions imposed in the application in which they were installed. Schaefer admitted that he knew that most of the compressors that had been delivered to Morris for the ice harvesters had failed due to seizures or related problems. *See* PX 170, 173.

Internal Dunham–Bush memoranda reveal that Dunham–Bush engineers and management made the deliberate choice not to do anything about the expected failures of its compressors in the Morris ice harvesters.[23] For example, it is clear that in January 1991, only three and a half months after Metro placed its initial order of ice harvesters and before Metro even received delivery of this order, Joe Orosz, one of Dunham–Bush's senior engineers and the engineer with the most detailed knowledge of the operation of the 1216SE compressor, had concluded that the compressors were defective. Orosz concluded that a likelihood of seizures was inherent in the design of the compressor as used in the Morris ice harvesters and that the problem could not be fixed with the kind of "fine tuning" changes Dunham–Bush had been making.[24] Although Orosz informed senior management of this conclusion, Dunham–Bush intentionally failed to disclose this conclusion to anyone.[25]

Dunham–Bush's mind set is well illustrated by its December 1990 company newsletter, which it sent to its customers. Dunham–Bush published an article stating that the Morris ice harvesters and the 1216SE compressors were a big success and that the "tailor-made" vertical screw compressor for the Morris ice harvester fit the product well. The article also stated that "[i]ts performance is outstanding; in fact, we have not experienced a single field failure." PX 154. This falsity was so patently wrong that Joe Querner, of Dunham–Bush, attached a note to a copy sent to Morris, stating that he was "bending the truth a bit."

Thus, Dunham–Bush recklessly ignored the explicit conclusion by its senior engineer that the product Dunham–Bush had promoted as being reliable and suitable had an inherent problem that would inevitably cause failures. By January 1991, Metro had expended only a modest portion of the funds necessary for constructing, installing, and making its thermal energy storage system operational.

Based on the foregoing evidence, the Court finds that Dunham–Bush acted with reckless disregard for the rights of end-users beginning in mid–1990 and thereafter, when it (1) promoted its compressors as specially designed before the compressors had been tested adequately; (2) failed to address the warnings from its own engineers of the problems in the compressors' design; and then (3) failed to communicate specifically to Morris and end-users, including Metro, that the 1216SE compressors were not in fact suitable for or reliable in the ice harvesters. Dunham–Bush's failure to disclose to end-users the operating problems the compressors repeatedly were experiencing and the likelihood of future failures were material deceptions to the end-users.[26]

### 2. Dunham–Bush's Knowledge of the Defects in Metro's Ice Harvesters Compressors

Not only did Dunham–Bush have general knowledge that its 1216SE compressor was a defectively designed product, it also had knowledge about Metro's specific problems with the compressors at the time Metro experienced each of its compressor failures.

Metro experienced its first failure in May 1991, only days or weeks after the thermal energy storage system became operational. After Dunham–Bush was informed that Metro had experienced a failure in a compressor

23. PX 29, at 1763–64, 1767.

24. PX 166, at 3.

25. PX 168. Schaefer testified that he did not agree with Orosz's observation and thus unilaterally decided to disregard it. Given Schaefer's estimate that he spent only 5% of his time on this project, it was reckless of him to ignore Orosz's serious observations.

26. The Court rejects Dunham–Bush's argument that it had no duty to tell Metro, as an end-user who had relied on Dunham–Bush's representations, that Dunham–Bush's prior affirmative and glowingly positive representations were incorrect. Before Metro placed its initial orders, Dunham–Bush knew and intended for its representations to be transmitted by Morris to potential end-users, and Dunham–Bush knew or easily could have learned who these potential end-users were. As evidence accumulated that the 1216SE compressor was a defectively designed product, Dunham–Bush failed to correct its erroneous representations and even *continued* to transmit reckless falsehoods regarding the compressor's quality.

in its initial order of ice harvesters, Dunham–Bush replaced these two compressors pursuant to its warranty. However, instead of using that opportunity to inform Metro truthfully about the difficulties Dunham–Bush and other end-users were experiencing with the compressors, Dunham–Bush compounded its misrepresentations by falsely telling Metro in July and August 1991 that the compressor failure it had experienced was "random" and "non-reoccurring" and that Dunham–Bush was aware of the need for high reliability in the compressors in Metro's facility.[27] In reliance on these assurances, Metro ordered two additional ice harvesters in June 1992 for expansion of its system.

In July 1992 (or August), another compressor failed and Dunham–Bush replaced it promptly.

Several months later, two additional compressors failed, one in October and one in December 1992. Before calling Dunham–Bush, Metro's representative, Wayne Hays, contacted Morris several times in 1992 and thereafter and requested that Morris get Dunham–Bush to replace these failed compressors. Morris refused because Metro had not yet paid for the last two ice harvesters ordered in June 1992.[28]

Hays, on behalf of Metro, then called Dunham–Bush directly and told Dunham–Bush that two more of its compressors had failed. No later than December 1992, Hays ask Dunham–Bush to honor its warranty by supplying Metro with new compressors, which would have allowed Metro to keep its ice harvesters, and thus its thermal storage system, working.[29] However, despite Dunham–Bush's knowledge that its warranty was passed along to the ice harvester end-users, Dunham–Bush refused to deal with Metro directly and referred Hays back to Morris, stating simply that Morris was Dunham–Bush's direct customer. Even though Hays offered to *purchase* two new compressors directly from Dunham–Bush, in lieu of demanding that its warranty be honored without inspection of the failed compressors, Dunham–Bush persisted in its refusal to deal with Metro at all. Thus, Dunham–Bush explicitly refused the compressor owner's request to honor its warranty.

### F. Damages Caused by the Defective Compressors

1. *Injury Suffered By Metro.*—As a result of the deficiencies in the 1216SE compressor, Metro's thermal storage system suffered six serious compressor-related problems. In industry parlance, five of these were "catastrophic," that is, total, compressor failures. Metro experienced these failures in May 1991 (within weeks

27. These assurances were in direct contradiction to the results of the Orosz analysis and the tear down reports that Dunham–Bush's engineers had prepared on other failed compressors.

28. Metro had not paid because it claimed the ice harvesters were defective. Metro contended that the ice harvesters did not operate at their promised capacity in the "chill mode."

29. The Court credits Hays's testimony that he placed several calls to Dunham–Bush in late November and then late December 1992. Hays was an especially candid and careful witness. He stated firmly that he informed Dunham–Bush's staff about Metro's compressor failures. Dunham–Bush's witnesses denied remembering receiving any telephone calls from Metro. Orosz, Dunham–Bush's engineer, testified that he has no recollection of any such calls. Similarly, Joe Querner, who was in charge of Dunham–Bush's warranty work, testified that he did not recall receiving any such calls and that he was likely to recall such calls if he had received them. The Court does not find Dunham–Bush's representatives' lack of recollection probative. Even if the Court were to credit this Dunham–Bush testimony, it is not probative. It is not surprising that these witnesses do not recall Hays's calls, given the large number of compressors sold by Dunham–Bush and the scope of their duties since 1992. Moreover, it is not clear that these two men are the only people at Dunham–Bush who would have received Hays's calls. In any event, Dunham–Bush's evidence is strongly outweighed by Metro's definitive telephone records and Hays's testimony, which the Court finds very credible.

However, the Court places little weight on Hays's claim that he placed one or more calls to Dunham–Bush in March 1993, after the third compressor had failed and another was making loud, abnormal noises. Hays has no independent recollection of these conversations, and the phone records are not definitive. In any event, whether or not the 1993 calls were made, Dunham–Bush was aware, from previous calls from Hays, that Metro needed to replace at least two failed compressors.

after the system became operational, at which time Metro had three ice harvesters); July (or August) 1992; October 1992 (while Metro still only had three ice harvesters); and in December 1992 and February 1993 (after the fourth and fifth ice harvesters were installed). Still another compressor began to make loud abnormal noises in February or March 1993. As described earlier, Dunham–Bush replaced without incident the first two compressors that failed in May 1991 and July 1992 [30] but refused to replace the compressors that failed in October 1992, December 1992, and February 1993.[31]

Each compressor failure resulted in the immediate shut-down of the ice harvester in which that compressor was installed. While each ice harvester shut-down did not cause the entire thermal energy storage system to shut down, the loss of each ice harvester put an increasingly serious strain on the system. Dunham–Bush's conduct prevented Metro from continuing to load shift and thus receive the economic benefit the system was designed to provide. These compressor failures and the resulting ice harvester failures resulted from the defects in the Dunham–Bush design and manufacture of the 1216SE compressors, which were unsuitable, as designed, for the ice harvester application.

In any event, for four months, from November 1992 through February 1993, the thermal energy storage system enabled the hospital to load shift and thus avoid any use of HL & P–provided electricity during peak hours. This load shifting was achieved despite the October and December 1992 compressor failures, which had not been fixed. However, by the time the fifth and last catastrophic failure occurred at the hospital in February 1993, three of the five ice harvesters were inoperable. Finally, in or about March 1993, when the fourth of Metro's five compressors malfunctioned by making loud, abnormal noises during operation and had to be shut down, Metro could no longer continue load shifting.

By this time, Metro had experienced more than a year and a half of costly engineering problems.[32] After working fruitlessly to fix the system, Metro finally gave up. In the spring or summer of 1993, Metro decided to

**30.** It is undisputed that Dunham–Bush promptly shipped replacements for these first two compressors, honoring Metro's warranty claims which Metro made through Morris. When these early failures occurred, Metro experienced minimal equipment downtime.

Meanwhile, however, in 1991 and 1992, Metro spent hundred of thousands of dollars to rework and repair problems (unrelated to the compressors) in the ice harvesters and in other parts of the thermal storage system. In the second quarter of 1992, Metro decided to purchase two additional ice harvesters to accommodate future expansion and to obtain some protective redundancy.

Metro tentatively expressed satisfaction with the ice harvesters' performance. By that point, Dunham–Bush knew well, but failed to inform Metro in connection with these replacements, or at any other time, that the compressors had inherent defects and reliability problems that were likely to cause further failures in the future. At that time, Metro was unaware of the inherent nature of the compressors' design problems. Metro's temporary belief that the system was as reliable as represented does not absolve Dunham–Bush of responsibility for its misrepresentations and omissions to perform as promised.

**31.** The equipment failures did not cause any personal injury or any damage to collateral property. Rather, the failures caused the ice harvesters to be unreliable and, at certain points in time, unusable. These failures did not result in complete system shut-downs because, in 1991 and until mid–1992, Metro had sufficient redundancy (back-up compressors) for the size of its facility, and because other problems with the system had prevented Metro from relying exclusively on the thermal storage system to provide cooling and air conditioning. However, by late 1992, Metro's hospital facility had grown and required more compressor capacity and reliability. At that point, Metro no longer had sufficient redundancy to compensate for any malfunctioning compressors. By this time, also, Metro had solved its other issues preventing continuous ice harvester operation. By December 1992, Metro had acquired two additional ice harvesters in order to avoid a total air conditioning failure in the hospital.

**32.** As Dunham–Bush points out, Metro's numerous other engineering problems with the ice harvesters and thermal energy storage system were unrelated to compressor performance. These problems were caused in material part by Metro's own engineering decisions and by defects in Morris's ice harvester, as well as to an extent the Dunham–Bush compressor design. In an attempt to remedy these problems, Metro hired various consultants and made numerous mechanical changes and additions to its thermal energy system and to the ice harvesters in particular.

abandon its entire thermal storage system project and to rely once again on its conventional cooling systems for the hospital's air conditioning and other cooling needs. Metro leased and then purchased a 200 ton "Carrier Chiller" unit in order to use a conventional cooling system. Eventually, Metro disassembled the ice harvesters.[33]

2. *Damages Caused By and Foreseeable to Dunham–Bush.*—Metro claims that it should recover approximately $2 million for certain of its construction costs for the building to house the thermal energy system, all costs of the components of and associated equipment for that system, all repairs and redesigns of it, all consultants hired to evaluate or solve the engineering and other difficulties, all demolition and thermal energy system disassembly costs, and all costs of leasing and purchasing conventional chillers that was substituted for the system.[34] The Court is unpersuaded that all of these damages have been proven to have been reasonably caused by or foreseeable to Dunham–Bush.

Metro's frustration is understandable in light of the problems it encountered with the ice harvesters generally and its disputes with Morris. However, the Court finds that Metro's decision to shut down its entire thermal energy storage system without consulting Dunham–Bush was not reasonable and was not foreseeable to Dunham–Bush. Nor was it foreseeable to Dunham–Bush that Metro and Morris would have disputes that would cause Metro to refuse to pay for two of its ice harvesters and would cause Morris to refuse to obtain replacements for Metro's failed compressors.

Thus, Dunham–Bush's compressors were only one of the performance issues Metro faced in its inability to make and then keep its thermal energy storage system operational. Dunham–Bush should not be held responsible for all Metro's costs for the entire system. The Court finds that Metro's decision to abandon the system resulted from an accumulation of years of problems, many of

which were not attributable to Dunham–Bush's product. Plaintiff did not establish that Dunham–Bush was even aware of many of Metro's difficulties. Therefore, there is inadequate probative evidence to justify charging Dunham–Bush with many of the damages Metro seeks. Although Hays spoke with Dunham–Bush in late 1992 and in 1993 to report the several compressor failures and Metro's need for replacement compressors, there is no evidence that Metro ever told Dunham–Bush that it was contemplating abandoning its entire thermal energy storage system, thus rendering all the construction, engineering and repair costs useless.

On the other hand, the Court finds that much of Metro's conduct in handling the Dunham–Bush compressor problems was reasonable. Metro made a good faith effort to avoid thermal energy storage system downtime by obtaining five ice harvesters in order to expand its system's capabilities and also to achieve substantial redundancy. However, Dunham–Bush's compressors resulted in Metro's ice harvesters, which experienced at least five compressor failures in under two years, fundamentally lacking the necessary reliability, even after all the other ice harvester problems had been solved.

Metro argues that if it had been told at any time of the problems of which Dunham–Bush was aware, Metro, at a minimum, would have avoided from that time forward any further expenditures on the thermal energy storage system it had selected, which had Dunham–Bush compressors as a primary component. Metro contends that in 1990, or even in mid–1991, it could and would have selected other equipment around which to design and construct its thermal energy storage system and the building to house the equipment. Even so, the Court finds that Metro has failed to prove that, had it chosen other equipment, it would not have incurred many of the costs it did with the Morris/Dunham–Bush system. Metro has requested damages that clearly include expenses not specifically related to the Morris ice harvest-

---

33. Months later the ice harvesters were returned to Morris "as is" by agreement in partial settlement of Metro's claims against Morris.

34. Metro also seeks $264,660 for the legal fees associated with Metro's dispute with Morris and another $337,255.74 in fees and expenses incurred in prosecuting this case.

ers and that would have been necessary no matter what equipment Metro had selected for the compressor in the ice harvesters in the thermal energy storage system. For instance, the evidence also establishes that Metro served as its own construction contractor. To some extent, Metro also engineered the incorporation of the ice harvesters into the thermal energy storage system and designed the way that system merged into the hospital's pre-existing heat and air conditioning ("HVAC") system. Metro engineers lacked any experience in thermal energy storage systems. Their decisions and the work they supervised caused some of the expenses of which Metro complains. The Court concludes that these expenses are not recoverable from Dunham–Bush.

The Court, additionally, is unpersuaded that Metro would have abandoned all efforts to install a thermal energy storage system if it had learned earlier about the Dunham–Bush compressors' defects. Rather, the evidence establishes that Metro would have selected a different system offered by one of the several other vendors Metro had contacted.[35] If in 1990 or even through mid–1991, Dunham–Bush had truthfully expressed concerns about its compressors' reliability in the Morris ice harvesters, Metro likely would have been able to reconfigure the building

that housed the ice harvesters (the "Central Plant Building") and the rest of the thermal energy storage system equipment, so that the building would have fit a different thermal energy storage system.[36]

The Court, therefore, is unpersuaded that it was reasonable for Metro to abandon completely its investment in the thermal energy storage system and expect to hold Dunham–Bush liable for its entire $2 million in thermal energy system costs. The Court finds that Metro made adequate attempts to mitigate its damages by investigating the possibility of redesigning the ice harvesters. Metro was not expected to become a test site for a newly designed and unique ice harvester or thermal energy storage system.[37]

In sum, the Court finds that it was or should have been foreseeable to Dunham–Bush that Metro or any end-user would not be able to operate a Dunham–Bush–based ice harvester system for any sustained period of time. However, it was not foreseeable that Metro would shut down and abandon all thermal energy storage efforts, at least not without first consulting Dunham–Bush in order to determine whether any other less costly measures could be taken to maintain the system.[38]

35. See DX 117, 123, 138.

36. Dunham–Bush's defense on damages primarily is that Metro's damages calculations included unnecessary expenses that were not supported by probative evidence and for which Dunham–Bush should not be held liable, even if it is liable for the failure of its compressors. The Court is unpersuaded by most of these arguments; the Court credits Huntsinger's testimony that he and others parsed the invoices for expenses incurred in constructing the thermal energy storage system and the building to house it, as well as the expenses of installing the new system into the hospital and related facilities. Moreover, there is little evidence to support the criticisms. In any event, the Court finds it unnecessary to parse these details in light of the limited categories of damages that the Court finds to be recoverable.

37. Dunham–Bush also appears to argue that Metro could have replaced the Morris ice harvesters with another manufacturer's chiller system within the existing thermal energy storage system. Dunham–Bush's expert witnesses focused mainly on replacement of the compressors and redesign of the ice harvesters internally. Passing references to the alternative of redesign-

ing the thermal energy system were left vague and undeveloped. The Court finds Dunham–Bush's experts' estimates of repair costs of $38,000 or $41,000 per ice harvester (for a total of $190–$205,000) unpersuasive, as described in the conclusions of law.

38. For example, Metro was able to keep the system operational for a period after Dunham–Bush replaced the first two failed compressors. Serious compressor problems arose only after Metro was unable to obtain replacements for its compressors that failed later. Thus, it appears that Metro might have found the Dunham–Bush compressors somewhat workable if Dunham–Bush maintained a sufficient supply of replacements and promptly provided replacements any time Metro experienced difficulties with a compressor. Although not an ideal solution, this alternative might have been more cost-effective than Metro's decision to abandon the entire system. In any event, had Metro consulted with Dunham–Bush about this decision, Dunham–Bush might have been more interested in working out such an arrangement than in bearing the cost for Metro's abandonment of its entire system.

## II. CONCLUSIONS OF LAW

For the reasons discussed below, the Court concludes that Dunham–Bush is liable to Metro for both fraud and breach of warranties.

### A. Fraud

#### 1. Economic Loss Rule

Before trial, Dunham–Bush strenuously argued in its Motion for Summary Judgment that, because this is a breach of contract case, Metro is barred from recovering for fraud. In its prior Memorandum and Order, the Court rejected this argument. Nevertheless, Dunham–Bush continues to insist that under the economic loss rule, Metro is limited to damages for breach of contract. Again, the Court rejects Dunham–Bush's argument.

■ In its prior Order, the Court analyzed a recent Fifth Circuit authority, *Heller Financial, Inc. v. Grammco Computer Sales,* 71 F.3d 518 (5th Cir.1996), that interpreted the Texas Supreme Court's decision in *Southwestern Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493 (Tex.1991), regarding when a party to a contract may be liable in tort. *See* Order, at 10–14. The Court concluded that, in order to succeed on its fraud claim, Metro must prove that Dunham–Bush committed fraud in the inducement of the contract and that, prior to Metro's purchase of the ice harvesters containing Dunham–Bush's compressors, Dunham–Bush never intended to honor its contractual duties. Recently, the Texas Supreme Court reached the same conclusion in *Formosa Plastics Corp. v. Presidio Engineers,* 1997 WL 378129 (Tex. July 9, 1997). In *Formosa Plastics,* the Court rejected "the application of *DeLanney* to preclude tort damages in fraud cases" and held that "a fraud claim can be based on a promise made with no intention of performing,

irrespective of whether the promise is later subsumed within a contract." *Id.* at *6. Thus, the Court concluded, "tort damages are not precluded simply because a fraudulent representation causes only an economic loss." *Id.*

As described below, the Court finds that Metro has met its burden of proof on its claim that Dunham–Bush fraudulently induced it to enter a contract.

#### 2. Elements of Fraud

■ In order for Metro to succeed on its fraud claim, it must prove that Dunham–Bush made "[1] a material misrepresentation, which was false, and [2] which was either known to be false when made or was asserted without knowledge of its truth, [3] which was intended to be acted upon, [4] which was relied upon, and which caused injury.'" *Id.* at *7 (quoting *Sears, Roebuck & Co. v. Meadows,* 877 S.W.2d 281, 282 (Tex. 1994)). In addition, Metro must prove that Dunham–Bush made the misrepresentation [5] "with no intention of performing [the promise] at the time it was made." *Id.*

■ The Court concludes, on the basis of the foregoing findings of fact, that Metro has met its burden to prove each of these elements. In this section, the Court will not repeat its factual findings in their entirety but will instead, for each element, briefly explain the basis for its conclusion and highlight the evidence that has persuaded it that Metro proved that element.[39]

#### a. Dunham–Bush made false, material representations.

Dunham–Bush made false, material representations to Metro regarding the quality of its compressors and their suitability for use in the Morris ice harvesters both through Morris[40] and directly to Metro.

---

**39.** The Court has carefully considered the many hundreds of exhibits and extensive evidence of record and attempts here merely to note the most salient facts forming the basis for its conclusions. Its factual basis is not restricted to the matters cited below.

**40.** Under Texas law, a fraud claim may be based on indirect representations. *See Custom Leasing,*

*Inc. v. Texas Bank & Trust Co.,* 516 S.W.2d 138, 142 (Tex.1974) (misrepresentation "may be made directly to the other [party] or by a manifestation to third persons intended to reach the other [party]"); *Atlantic Richfield Co. v. Misty Products, Inc.,* 820 S.W.2d 414, 418 (Tex.App.—Houston [14th Dist.] 1991, writ denied).

Through the promotional literature Dunham–Bush provided to Morris for distribution to potential end-users, Dunham–Bush made specific representations to Metro: Dunham–Bush represented that its 1216SE compressors were specially engineered for and suitable for use in the Morris ice harvesters and would operate at a specified rated capacity. Dunham–Bush supplied written and oral information in which it represented that its compressors would perform reliably and consistently with industry and the company's own overall averages and that its compressors would have a failure rate of 3% during the first year and 10% during the first ten years of operation. These representations were false. As described above, the 1216SE compressor was not suitable for or reliable for use in the Morris ice harvester. These compressors had not achieved—at the time the representations were made or thereafter—anywhere near as low a failure rate as Dunham–Bush represented. Indeed, Dunham–Bush had experienced virtually a 100% failure rate at about the time of Metro's order and substantially greater than a 50% failure rate during the compressor's first year or two of operation, at the time the ice harvesters were installed at Metro's facilities in approximately May 1991. Dunham–Bush had no reasonable basis on which to rely in making the representations it made to Morris, which it authorized Morris to pass along to potential buyers and which Dunham–Bush knew that Morris in fact repeated in its sales material.

Dunham–Bush also made material misrepresentations *directly to Metro* regarding the compressors' quality when it stated to Metro in letters dated July 30, 1991, and August 8, 1991, that the compressors were "specially designed" for the Morris ice harvester application, suggested that they were highly reliable, and assured Metro that its compressor failure was a "random" event and would be "non-reoccurring." These statements were false when made, as evidenced by a compari-

son to Dunham–Bush's own contemporaneous internal documents.

Although Dunham–Bush may have *attempted* to create a compressor that was "specially designed" to be appropriate for and reliable in the Morris ice harvester, Dunham–Bush knew or should have known as early as September 1990 that it had not succeeded. This conclusion was strongly reinforced when, later in 1990 and in 1991, Dunham–Bush received performance results showing continuing frequent compressor failures. At the time of Dunham–Bush's material representations to Metro directly or indirectly through Morris's authorized comments and materials, the 1216SE model was only a product in development. In fact, the 1216SE compressor had never shown sufficient success in the Morris application to be honestly represented as reliable, "specially designed" equipment. In addition, because of what Dunham–Bush knew or should have known by early 1991 were inherent design problems in the 1216SE compressor installed in the Morris ice harvesters, end-users' problems with its compressors were at least likely, if not certain, to occur and recur.

Finally, Dunham–Bush also made misrepresentations by omission; as more information came to Dunham–Bush's attention from both external and internal sources, Dunham–Bush failed to disclose to Metro and other potential end-users information regarding the 1216SE compressor's failure in other applications and Dunham–Bush's engineers' concerns about the compressor's design. Under Texas law, a misrepresentation may occur when a party conceals or fails to disclose a material fact and the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth. *See New Process Steel Corp., Inc. v. Steel Corp. of Texas, Inc.,* 703 S.W.2d 209, 214 (Tex.App.—Houston [1st. Dist.] 1985, writ ref'd n.r.e.) (discussing fraud by omissions).[41]

41. Dunham–Bush argues that it had no duty to disclose this information to Metro because Metro was not Dunham–Bush's direct customer. The Court rejects this argument. Dunham–Bush knowingly conveyed representations through Morris to end-users, such as Metro, regarding

Dunham–Bush's compressors, and therefore could and should have conveyed information qualifying its earlier representations. Although Dunham–Bush was under no obligation to convey any representations whatsoever to potential end-users regarding its compressors, *see Pruden-*

**b. Dunham–Bush made the misrepresentations as positive assertions and made them recklessly without any knowledge of their truth.**

Dunham–Bush's representations were not vague, did not include limiting qualifiers, and were not mere promotional exaggerations. Instead, its representations were positive assertions regarding the compressors' quality and suitability. Based on the initial reports of problems with the 1216SE compressor, of which Dunham–Bush was already aware at the time it made representations to Metro, Dunham–Bush either knew or should have known that its representations were false. Moreover, Dunham–Bush lacked sufficient information to make the unqualified representations of suitability and reliability. The Court therefore finds that Dunham–Bush made the representations recklessly without any knowledge of their truth.

**c. Dunham–Bush made the misrepresentations with the intention that they would be acted upon by Metro.**

There is no doubt that, with respect to the representations made through Morris, Dunham–Bush authorized Morris to distribute the statements regarding the compressors' suitability and statistical reliability in its promotional materials with the intention that potential end-users, such as Metro, would act upon these representations by purchasing Morris ice harvesters equipped with Dunham–Bush compressors.[42] Indeed, this goal

---

*tial Insurance Company of America v. Jefferson Associates, Ltd.*, 896 S.W.2d 156, 163 (Tex.1995) (seller's expertise does not in itself impose duties of disclosure on seller), Dunham–Bush's communication to Morris of favorable representations for transmission to end-users imposed on Dunham–Bush the duty to convey accurate and full, or at least balanced, representations regarding the compressors' expected quality and reliability. *See American Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 436 (Tex.1997) ("when circumstances impose upon a party a duty to speak and the party remains silent, the silence itself can be a false representation") (citing *Spoljaric*, 708 S.W.2d at 435); *Southeastern Financial Corp. v. United Merchants & Mfrs., Inc.*, 701 F.2d 565, 566 (5th Cir.1983) ("a duty to speak may arise from partial disclosure, the [speaker] being under a duty to tell the whole truth although he was required to say nothing, for one may convey a false impression by the disclosure of some facts and the concealment of others") (citation omitted).

In addition, Dunham–Bush argues that it had no duty to inform Metro or other potential end-users that the 1216SE compressors were not reliable or suitable for the Morris ice harvesters because it had no duty to disclose facts it did not know. The Court rejects this argument as unsupported by the weight of the credible evidence. First of all, before Dunham–Bush had obtained any results regarding the compressor's performance in the field, it had no knowledge or basis for any representation that the compressor was suitable or reliable; thus, its representations in 1989 and early 1990 that the compressor was suitable and reliable were reckless, if not false. Nevertheless, even *if* Dunham–Bush originally released its promotional representations to Morris for distribution to potential end-users before it obtained any field results, and if Dunham–Bush made these representations in the good faith, but mistaken, belief that they were true, Dunham–Bush's failure to correct those representations after it re-

ceived repeatedly poor field results by 1990 and 1991 constituted a material misrepresentation by omission. *See Susanoil, Inc. v. Continental Oil Co.*, 519 S.W.2d 230, 236 n. 6 (Tex.Civ.App.—San Antonio 1975, writ ref'd n.r.e.) (one who makes false representations in good faith is liable if he later discovers the falsity of the representation but fails to disclose or correct it).

**42.** In addition, the evidence established that Dunham–Bush performed capacity tests on the compressors. According to engineering data sheets compiled at Dunham–Bush, Dunham–Bush knew, as a result of these tests, that the compressors were not working at their published capacity levels even before they were installed on-site in the ice harvesters. These sheets indicated that the compressors' actual capacity was often at least 10% below the capacity expected of them based on Dunham–Bush's representations. Dunham–Bush argued at trial that these disparities were not material and could be explained by the differences between the test conditions and the field conditions at Morris's and end-users' facilities. However, the Court is unpersuaded by this argument. The explanations offered by Dunham–Bush's engineers appeared at best to be after-the-fact rationalizations. Dunham–Bush did not adequately justify the differentials between expected and actual capacities and did not even explain why it did not create and test its compressors in an environment more comparable to the field conditions in which the ice harvesters would operate. Dunham–Bush failed to publish accurate data for the 1216SEs, rather than its standardized data derived from its other compressors. Dunham–Bush nevertheless used generally available data in conjunction with its public statements that the ice harvesters' compressors were "specially designed," "suitable," and "reliable." This is another independent basis for the Court's finding that Dunham–Bush acted recklessly at a minimum in making the representations on which Metro relied.

also was evident in Dunham–Bush's agreement to give a five year warranty, which Dunham–Bush representatives acknowledged was designed to give the end-user a "warm" feeling about Dunham–Bush's product and to convey the manufacturer's apparent confidence in the product.

With respect to the representations made directly to Metro, the Court also finds that Dunham–Bush made these representations with the intention that Metro, despite its problems with the compressors, would continue trying to make the ice harvesters and its entire thermal storage system work. Dunham–Bush's assurance in August 1991 to Metro that its first compressor failure was a "random" and "non-reoccurring" event was intended to promote Dunham–Bush's own future sales and to avoid Metro's attempting to substitute another brand compressor.

### d. Metro acted in reliance upon the misrepresentations and thereby suffered injury.

■ After considering all of the parties' testimony at trial, the Court is convinced that when Metro decided to construct a thermal energy storage system, it chose to build a system designed around Morris ice harvesters equipped with Dunham–Bush compressors in reliance in material part upon Dunham–Bush's representations regarding the reliability and suitability of its compressors. But for Dunham–Bush's representations, it is likely that Metro would have chosen a different system altogether. In reliance on Dunham–Bush's representations, Metro invested approximately a million dollars in constructing and then expanding a thermal energy storage system, the operation of which depended on Dunham–Bush's compressors. However, because the 1216SE model compressor was a flawed product when installed in the Morris ice harvester, the only application for which it was designed, Metro suffered serious economic injury.

Dunham–Bush adamantly argues that Metro, a sophisticated corporate consumer which was assisted by a team of engineer consultants in its selection of a thermal energy storage system, did not actually rely on Dunham–Bush's representations regarding the reliability and suitability of its compres-

sors. In short, Dunham–Bush contends that Metro knew that thermal energy storage, particularly with Morris's design, was a new area of technology and that Metro relied on Morris's factory tests which Metro representatives observed.

The Court substantially disagrees with Dunham–Bush's analysis. Metro was told that Morris's ice harvester was a well established product and that reliability of Morris's equipment was enhanced further by Dunham–Bush's compressors. In any event, Dunham–Bush made representations that assured Metro that the compressors used in the ice harvester would be reliable. Dunham–Bush never qualified its representations about reliability by informing Metro or other end-users that the 1216SE compressors were still effectively in an experimental phase and had not yet performed to industry reliability standards. Even if Metro knew that it was engaging in some risk by constructing a thermal energy storage system, Metro reasonably relied on Dunham–Bush's assurances that it need not worry about the performance of its compressors within that system.

Dunham–Bush contends that Metro decided to construct a thermal energy storage system *per se* before examining Dunham–Bush's representations regarding its compressors. This fact is irrelevant to the sufficiency of Metro's claim; this fact is material only to the damages to which Metro may be entitled. Although Metro did not rely on Dunham–Bush's representations in its initial decision to construct some form of thermal energy system, Metro did rely on Dunham–Bush's representations in its decision to build its system around the Morris ice harvesters equipped with Dunham–Bush compressors. Metro clearly relied on Dunham–Bush's prominence in the market, its "full five year warranty," and its representations regarding the suitability and reliability of its compressors that were included in materials Metro received through Morris.

Furthermore, under Texas law, Dunham–Bush may not prevail merely by showing that Metro *should have known* that another's representations were inaccurate. Instead, in order to negate Metro's claim of reliance, Dunham–Bush must prove that Metro had

"actual knowledge of the misrepresentations." *Koral Indus. v. Security–Connecticut Life Ins. Co.*, 802 S.W.2d 650, 651 (Tex. 1990) (per curiam). In other words, Dunham–Bush must show that Metro knew that the specific statements Dunham–Bush made with respect to its compressors were untrue. The trial record contains no evidence whatsoever that, prior to purchasing the ice harvesters, Metro knew that Dunham–Bush's reliability statistics and statements regarding its compressors' suitability for the Morris ice harvesters were untrue. Dunham–Bush therefore has not overcome Metro's proof that it relied on Dunham–Bush's representations.

### e. Prior to Metro's entry into the contract, Dunham–Bush never intended to perform its contractual duties.

Because the 1216SE compressor was a flawed and unreliable product when installed in Morris's ice harvesters, and because, prior to the time that Metro entered into its contracts to purchase Morris ice harvesters equipped with the 1216SE compressor, Dunham–Bush had knowledge of the compressor's lack of proven reliability, the Court finds and concludes as a matter of law that Dunham could not have intended to perform its duty, as promised, to provide Metro with compressors that were suitable and reliable for use in the Morris ice harvesters.[43] The evidence established that, when Metro purchased its ice harvesters, Dunham–Bush supplied compressors that it knew had not met its representations of suitability and reliability in the Morris application and Dunham–Bush knew or should have known were defectively designed, and thus fundamentally unsuitable, for this application. Therefore, the Court finds and concludes, based upon the evidence of record, that prior to Metro's entry into the contracts, Dunham–Bush had no intention of performing its contractual duties of supplying a truly reliable compressor for the ice harvesters.[44] Prior to delivery of Metro's compressors, in late 1990 or 1991, Dunham–Bush had actual knowledge that virtually every 1216SE compressor installed in a Morris ice harvester had failed. Also, Dunham–Bush, at the same time it allowed Morris to tout the compressors' reliability in 1990–1992, agreed to keep (and in fact did keep) in stock a replacement compressor for every model Dunham–Bush had supplied to Morris for its ice harvesters. Moreover, Dunham–Bush knew, despite its assurances of its compressors' suitability and special design, that it was continuing throughout 1989, 1990, 1991, and into 1992 to make design changes to obtain the reliability it expected under published industry standards. Rather than the 3% failure rate Dunham–Bush had promised for the first year, the 1216SE had experienced an 80%–100% failure rate in the ice harvesters as of September 1990, the month Metro placed its order.[45]

43. Even if Dunham–Bush intended to continue improving the design of its compressors after Metro's purchase of the ice harvesters, Dunham–Bush still would be liable. Dunham–Bush's duty was not merely to supply compressors while in development; its duty was to supply compressors that in fact were reliable in operation and suitable from the time of their installation. Dunham–Bush's duty also was to represent accurately the performance history, or lack thereof, of the compressor model being supplied.

44. *See Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432 (Tex.1986); *Peco Construction Co. v. Guajardo*, 919 S.W.2d 736 (Tex.App.—San Antonio 1996, writ denied). Dunham–Bush argues that because Metro's fraud claim is based on Dunham–Bush's promises that the compressors were of a certain quality and were suitable for the Morris ice harvester application, it is logically impossible for Dunham–Bush to have intended not to perform on those promises *in the future.*

However, the *Formosa Plastics* and *Heller* requirement that a party have no intention to perform its promises does *not* require that the breaching action or omission must occur in the future. Instead, the rule merely requires that *at the time* the contract is entered, the breaching party intended or had knowledge that it would not be meeting up to its contractual duties. In Texas cases following *Heller*, courts have upheld fraud claims for economic losses that involved misrepresentations regarding the state of affairs at the time the contract was made. *See, e.g., Howell Crude Oil Co. v. Donna Refinery Partners, Ltd.*, 928 S.W.2d 100 (Tex.App.—Houston [14th Dist.] 1996, writ denied) (upholding DTPA judgment for economic losses against oil seller who made a variety of misrepresentations regarding contemporaneous facts, including misrepresentations that its oil had "characteristics, uses, [and] benefits that it did not have").

45. *See* DX 412.

## B. *Breach of Warranty*

### 1. *Privity of Contract*

■ In its Order of October 16, 1996, the Court rejected Dunham–Bush's argument that, because the parties were not in privity of contract, Dunham–Bush could not be held liable to Metro on a warranty claim. Nevertheless, Dunham–Bush continues to urge, in light of evidence presented at trial, that Metro could only enforce a warranty against its direct seller, Morris. After considering the witnesses' testimony and other evidence, the Court reaffirms its conclusion that lack of privity presents no barrier to Metro's warranty claim.

In its Order, the Court noted several Texas court cases that have enforced warranties despite the absence of privity between the parties.[46] In addition, the Court described a recent authority, *Hininger v. Case Corp.,* 23 F.3d 124 (5th Cir.1994), in which the Fifth Circuit affirmed a dismissal of a warranty claim brought by end-users of a combine against a component parts wheel manufacturer. The Court concludes that the case at bar is clearly distinguishable from *Hininger* for the following reasons.

First, the evidence presented at trial persuades the Court that the Dunham–Bush compressors were not merely anonymous, unbranded components of the Morris ice harvesters. Instead, Dunham–Bush was the manufacturer of a central element of the ice harvester system. Unlike the component parts manufacturer in *Hininger* who supplied merely wheels for the combine, one of "myriad components that make up the combine," *id.* at 128, Dunham–Bush created the centerpiece of the ice harvesters. The success of the ice harvesters depended largely upon the reliability and suitability of the compressors installed within.

Second, in *Hininger,* the court noted that when the end-users purchased the combine, they "had no expectation that [the defendant] or any of the other manufacturers of unbranded components would resolve any problem they might experience with the combines." *Id.* The court based this conclusion on the observations that the plaintiffs did not "contend that [they] had any contact with [the defendant], that [the defendant's] name was on the wheels, or that [the defendant] advertised its product to the public at-large." *Id.* at 128 n. 3. In contrast, Dunham–Bush's name was prominently connected with its compressors, and Dunham–Bush was intimately involved in the design and marketing of the Morris ice harvester-based thermal storage system to potential end-users. In addition, after the first compressors malfunctioned, Dunham–Bush made affirmative representations directly to Metro, which were material considerations in Metro's decision to purchase two additional compressors. Thus, the evidence in the case at bar establishes that, even if Metro expected to turn first to Morris if it had problems with the ice harvesters, Metro could have reasonably looked to Dunham–Bush for assistance when Morris refused to assist it in repairing or replacing malfunctioning compressors.

Third, the fact that Dunham–Bush was able to communicate its written warranty to Metro supports the Court's conclusion that lack of privity is not a bar to Metro's warranty claims. In holding that a component parts manufacturer could not be held liable for an end-user's claim for breach of warranty, the *Hininger* court noted the practical difficulty that a component manufacturer would ordinarily face in effectively disclaiming its liabil-

---

46. *See* Order, at 6 n. 19, 8 nn. 25, 26 (citing *Nobility Homes of Texas, Inc. v. Shivers,* 557 S.W.2d 77, 81 (Tex.1977) (implied warranty); *Indust–Ri–Chem Laboratory, Inc. v. Par–Pak Co., Inc.,* 602 S.W.2d 282 (Tex.Civ.App.—Dallas 1980, no writ) (interpreting *Nobility Homes* to cover express, as well as implied, warranties; manufacturer who provided samples to intermediate seller with knowledge they would be used to induce sale of product to ultimate buyer could be sued by buyer on express warranty to intermediate seller); *National Bugmobiles, Inc. v. Jobi Properties,* 773 S.W.2d 616, 622 (Tex.App.—Corpus Christi 1989, writ denied) (because an exterminator who provided a warranty to a homeowner knew that the homeowner would one day use the warranty to induce the sale of the home, the home buyer could enforce the warranty against the exterminator despite the absence of privity); *Crosbyton Seed Co. v. Mechura Farms,* 875 S.W.2d 353, 361 (Tex.App.—Corpus Christi 1994, no writ) (privity of contract not necessary to enforce a warranty when original seller knew that direct seller was only a middle person in the transaction)).

ity to an end-user. *See Hininger,* 23 F.3d at 129 (quoting *Patty Precision Products Co. v. Brown & Sharpe Mfg.,* 846 F.2d 1247, 1257 (10th Cir.1988) (Logan, J., concurring in part and dissenting in part)). However, in the case at bar, Dunham–Bush proved itself capable of communicating to Metro its special five year warranty as well as other representations regarding its compressors' reliability and suitability.

In addition, this Court held in its earlier Order that at trial it would consider the question of for whom Dunham–Bush's warranty was intended. The Court concludes that Dunham–Bush's warranty was clearly intended to benefit end-users such as Metro. Dunham–Bush strenuously argues that it made its warranty to Morris and that therefore only Morris was eligible to invoke it. However, the evidence contradicts this assertion. By communicating to Morris that Dunham–Bush intended to offer a special five year warranty to help Morris and Dunham–Bush together enter the thermal storage market, Dunham–Bush indicated that it intended for its warranty to benefit end-users. Dunham–Bush did not merely offer the warranty to Morris in order to persuade Morris to use Dunham–Bush compressors in its ice harvesters. Instead, Dunham–Bush offered the warranty as part of its suggestion to Morris that, together, they could entice end-users to purchase Morris ice harvesters equipped with Dunham–Bush compressors. Finally, Dunham–Bush dealt directly with Metro in mid–1991, after Metro's first compressor failure, which further demonstrated all parties' intent for Metro to receive the warranty from Dunham–Bush. The Court thus rejects Dunham–Bush's contention that its warranty was only intended for the benefit of Morris.[47]

## 2. *Scope of Warranty*

Metro contends that Dunham–Bush is liable for breach of not only its express five year "parts and labor" warranty (the "limited warranty"), but also for breach of implied warranties and breach of an express warranty that the compressors would be suitable for the Morris ice harvesters and have the reliability and capacity Dunham–Bush had represented. Dunham–Bush argues that the invoices and operating manuals which accompanied the ice harvesters contained disclaimers that effectively disclaimed all implied warranties and that limited express warranties to the five year parts and labor warranty. The Court concludes that Dunham–Bush's warranty disclaimers and limitations were ineffective for two reasons. First, the Court does not find that Metro received these disclaimers or limitations prior to purchasing the ice harvesters containing Dunham–Bush's compressors. Second, the Court finds that the disclaimers and limitations are, in any event, invalid because the parts and labor warranty, with which they were associated, failed of its essential purpose. Therefore, Dunham–Bush is liable for breach of its express warranty regarding suitability, reliability, and capacity and breach of the implied warranty of fitness for a particular purpose.

### a. *Failure of Disclaimers and Limitations*

■ In order to be effective, disclaimers and limitations of warranties must be conspicuous to a reasonable person against whom the disclaimer or limitation is intended to operate. *See Cate v. Dover Corp.,* 790 S.W.2d 559, 560 (Tex.1990). In this case, the Court finds that Dunham–Bush's attempt to disclaim implied warranties and limit its express warranties were not conspicuous to Metro. Although Dunham–Bush succeeded in conveying to Metro, before Metro placed

47. Dunham–Bush also argues that even if it gave Morris the right to assign the warranty to end-users, Morris failed to do so. This contention is without merit. The evidence establishes that Morris, as part of its bid proposal, did assign the warranty to Metro. Morris's order acknowledgment confirms this, as does the parties' course of conduct. *See* PX 126, 131, 135. For instance, the operating manual Morris provided for the ice harvesters stated that "[t]he manufacturer [Mor-

ris] shall provide replacement parts F.O.B. factory for any defective part during the terms of this warranty. On component parts purchased from outside suppliers, the warranty of that supplier shall be passed on to the purchaser." *See* PX 135, at 9 (Bates No. 37) ("Warranty"). Also, Dunham–Bush's July 30, 1991, and August 8, 1991, correspondence to Metro corroborates this intent.

its first order for ice harvesters, its express five-year warranty and its warranty regarding suitability and reliability, Dunham–Bush did not attempt to communicate any disclaimers or limitations until *after* Metro had purchased the ice harvesters. There is no evidence that Metro ever received Dunham–Bush's invoices, which were sent to Morris. Metro only received Dunham–Bush's operating manual containing the purported disclaimers and limitations, only when or after Metro received its initial ice harvesters.

A disclaimer conveyed after a buyer enters a contract is ineffective. As one Court has explained:

> The very purpose of the statutory [disclaimer] requirement is that any limitation be brought to the attention of the buyer at the time the contract is made. An attempted limitation at the time of delivery long after a contract of purchase is signed does not accomplish this purpose, being a unilateral attempt of a party to limit its obligations.

*Mack Trucks of Arkansas, Inc. v. Jet Asphalt and Rock Co.*, 246 Ark. 101, 437 S.W.2d 459, 463 (1969) (cited in *Cate*, 790 S.W.2d at 561 n. 3).[48] Moreover, Dunham–Bush's conveyance of disclaimers and limitations to Morris were not effective as to Metro since Metro did not receive notice of them. *See also Patty Precision*, 846 F.2d at 1257 (disclaimers provided to intermediary are not binding on parties who purchase without notice of such limitations).

### b. *Failure of "Parts and Labor" Warranty's Essential Purpose*

■ Metro also argues that Dunham–Bush's alleged attempt to limit its express warranties by offering a limited five-year "parts and labor" warranty and to disclaim all implied warranties in conjunction with that limited warranty was ineffective as a matter of law because the limited warranty failed of its essential purpose. In support of this argument, Metro contends that, under § 2.719(b) of the Texas Business and Commerce Code, where repeated efforts to correct a product defect fail to remedy the problem, a limited warranty fails of its essential purpose and a buyer is entitled to more expansive remedies. *See Reynolds Metals Co. v. Westinghouse Elec. Corp.*, 758 F.2d 1073, 1078 (5th Cir.1985) (warranty disclaimer did not protect seller whose breach of contract constituted a total failure of performance); *Mercedes–Benz of North America, Inc. v. Dickenson*, 720 S.W.2d 844, 854 (Tex. App.—Fort Worth 1986, no writ). Thus, Metro argues that when Dunham–Bush proved unable (or unwilling) to repair or replace the compressors with suitable products, Metro ceased to be limited to the parts and labor replacement warranty and became entitled to seek money damages. The Court agrees and concludes that this is an alternate ground for holding that Dunham–Bush's warranty limitations and disclaimers are not effective against Metro.

When Metro experienced its first compressor failures, Dunham–Bush corrected the problem by quickly supplying replacements. Even when two other compressors failed in mid–1992, Metro was able to continue operation of the other ice harvesters, and thus the thermal energy system, and was able to achieve successful load-shifting during November and December 1992 and January and February 1993 without interruption. This solution should have been available for the balance of the five year term of Dunham–Bush's express limited warranty. Had Dunham–Bush continued to replace the compressors when Metro suffered further failures, Dunham–Bush could have fulfilled the terms of its limited warranty (to the extent it was effective against Metro) and would not be liable for breach of other express and implied warranties. However, the Court finds and concludes that because Metro has proven that it was unable to obtain the replacement compressors from Dunham–Bush, Dunham–Bush's limited warranty failed of its essential purpose by no later than March 1993.[49]

---

**48.** In addition, the operating manual was for 1216 compressors generally, not the 1216SE. Thus, Metro was not ever given notice that the 1216SE compressors in fact were subject to some of the terms in the preprinted booklet.

**49.** Alternatively, the Court concludes that Dunham–Bush's express limited warranty failed of

Dunham–Bush's disclaimers of all other express and implied warranties were thus negated, and Metro is entitled to rely on Dunham–Bush's express promises of suitability and reliability, as well as the implied warranty of fitness for a particular purpose.

### c. Applicable Warranties

■ Under §§ 2.313(a)(1) and (2) of the Texas Business and Commerce Code, an express warranty includes any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain and any description of the goods which is made part of the basis of the bargain. Thus, Dunham–Bush's representations regarding the suitability and reliability of its compressors created an express warranty that the compressors would be of the quality promised. As discussed above in the Court's findings of fact, Dunham–Bush breached this express warranty to Metro. Its representations that the 1216SE compressor was reliable and suitable for use in the Morris ice harvesters and would operate at a specified capacity were false; the 1216SE compressor was a defective product that did not meet up to the promises Dunham–Bush recklessly made about its quality.

■ Under § 2.315 of the Texas Business and Commerce Code, a warranty that goods shall be fit for a particular purpose is implied where the seller, at the time of contracting, has reason to know any particular purpose for which the goods are required and to know that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods. In this case, not only was Dunham–Bush aware that the Morris ice harvesters equipped with Dunham–Bush's compressors would be used as a fundamental component of industrial and commercial thermal energy storage systems, Dunham–Bush affirmatively attempted to design its compressors specifically for this use. Dunham–Bush cannot credibly argue that it was unaware of the significance of its product in the thermal energy storage systems in which the ice harvesters were used.

■ Although Metro was assisted by engineering consultants in its selection of a thermal energy storage system, Metro and its consultants were not as versed as Dunham–Bush was in Dunham–Bush's specialty area of compressor technology and the analysis of suitability of a particular compressor for the unique Morris ice harvester application. Thus, Metro relied on Dunham–Bush's skill in providing suitable compressors to operate in its thermal energy storage system. As described previously, Dunham–Bush breached this implied warranty by not providing Metro with compressors that were fit for the particular purpose for which Dunham–Bush represented they were suitable.[50]

### 3. Notice and Opportunity to Cure Breach of Warranty

Dunham–Bush argues that it cannot be liable for any breaches of warranty because Metro failed to notify Dunham–Bush of its alleged breach and give Dunham–Bush an opportunity to cure the breach, as required under Tex. Bus. & Com.Code § 2.607(c); *Palmco Corp. v. American Airlines, Inc.*, 983 F.2d 681 (5th Cir.1993). The Court rejects this argument as unsupported by the weight of credible evidence. As described previously, no later than December 1992, Dunham–Bush had specific notice of four of its compressors' catastrophic failures (in May, 1991, and July, October, and December 1992), and thus had notice that its compressors had not

its essential purpose from the time Metro first purchased the ice harvesters because the compressors Dunham–Bush supplied were defectively designed, the replacements were similarly defective, and repeated replacements were unlikely to cure the fundamental problem of unreliability in the ice harvesters.

**50.** The Court does not find that the implied warranty of merchantability applies in this case because, in order to be merchantable, goods must, among other things, be "fit for the ordinary purposes for which such goods are used." Tex.

Bus. & Com.Code § 2.314(b)(3). Because the 1216SE compressors were, purportedly at least, specially designed for use only in the Morris ice harvester application, there is no "ordinary purpose" by which these compressors can be judged. Instead, the implied warranty of fitness for a particular purpose applies more appropriately to the facts of this case. In any event, this distinction is not material because the type of implied warranty does not affect the remedy to which Metro is entitled.

met up to the company's express warranty of reliability and suitability and the implied warranty of fitness for a particular purpose. In addition, Dunham–Bush had specific notice that Metro intended to hold Dunham–Bush, and not just Morris, responsible for honoring the warranty on the compressors when Metro informed Dunham–Bush in late 1992, with reference to the last two failures, that Metro was no longer working with Morris and Metro offered to purchase additional compressors directly from Dunham–Bush. Thus, the Court finds that Dunham–Bush had adequate notice and opportunity to cure its breach, had such a cure been possible. *See Reynolds*, 758 F.2d at 1078 (notice provisions under § 2.607(c) "are not stringent and are liberally construed by the Texas courts. The question of the adequacy of such notice depends on the reasonableness of the efforts by the wronged party to communicate his dissatisfaction with the tendered performance, considering all the circumstances.") (internal citation omitted).[51]

## C. Damages

Having determined that Dunham–Bush is liable to Metro for fraud and breach of warranties, the Court must next determine an appropriate amount of damages Metro may recover.

### 1. Fraud Damages

When a party proves that it was defrauded, it is entitled to both direct and consequential damages which it suffered as a result of its reasonable reliance on the defrauding party's representations. *See Arthur Andersen & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812, 816 (Tex.1997). In this case, Metro has the burden of proving, by a preponderance of the evidence, that its claimed damages naturally and necessarily flow from Dunham–Bush's fraudulent misrepresentations and were foreseeable. Metro's damages may be measured either by the difference between the value Metro paid and the value Metro received (out-of-pocket damages) or by the difference between the value as represented and the value received (benefit-of-the-bargain damages). *Formosa Plastics*, 1997 WL 378129, at \*9; *Arthur Andersen*, 945 S.W.2d at 816.

Metro seeks out-of-pocket damages of $2 million, which it claims represents the total sum it spent after mid–September 1990 in connection with constructing the original thermal energy storage system, as well as portions of the building to house the system; expanding the system in 1992; maintaining the system; repairing the system to eliminate problems caused by Morris's and Metro's own engineering errors; leasing and then purchasing a replacement chiller unit; disassembling the ice harvesters after they were shut down; and Metro's future damages of demolishing the structure in which the thermal energy system was housed.[52] Dunham–Bush challenges Metro's damage calculations by arguing that it was not foreseeable that Dunham–Bush could be held liable for this entire investment plus all associated costs and that Metro failed to mitigate its damages. Dunham–Bush also argues that numerous expenses claimed by Metro were not reasonable or necessary to the thermal energy system. The Court finds that a portion of Metro's claimed damages were fore-

**51.** Dunham–Bush also contends that there was no warranty on the last three compressors that failed because Metro had not paid Morris for all of the ice harvesters in which they were installed at the time that the compressors failed. The Court rejects this argument, however, because at least two of these three compressors were in the ice harvesters originally delivered in 1990, *see, e.g.*, DX 412, for which Dunham–Bush does not deny that Metro paid Morris. In addition, when Metro requested replacements directly from Dunham–Bush for these failed compressors, Dunham–Bush did not tell Metro that it was refusing to honor its warranty because of Metro's non-payment. Thus, the Court finds that Dunham–Bush is estopped from asserting this issue at this time. Finally, the Court rejects this argument because Dunham–Bush did not establish conclusively at trial whether or not *it* had received payment from *Morris* for these compressors.

**52.** Metro contends (on the basis of PX 467 and the damages documentation offered as backup, PX 1–29) that it should recover approximately $2 million, which it claims to have spent on the thermal energy storage system in reliance upon Dunham–Bush's representations. This total consists of almost $1.4 million allocated to various accounts for the construction of the thermal energy storage system in 1990–92.

seeable and that Dunham–Bush did not meet its burden to show that Metro failed to mitigate.

### a. *Foreseeability*

■ Under Texas law, in order for a plaintiff to recover direct or consequential fraud damages, those damages must have been foreseeable by the tortfeasor. As the Texas Supreme Court recently explained,

> Direct damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong.... Consequential damages, on the other hand, result naturally, but not necessarily, from the defendant's wrongful acts.... They need not be the usual result of the wrong, but they must be foreseeable, and they must be directly traceable to the wrongful act and result from it.

*Arthur Andersen*, 945 S.W.2d at 816. In this case, the Court is persuaded that only some of Metro's claimed damages were a foreseeable consequence of Dunham–Bush's fraudulent representations.

■ The Morris ice harvesters supplied to Metro were inextricably intertwined with the Dunham–Bush compressors. Given that Dunham–Bush actively promoted its compressors as suitable for and specially designed for use in the Morris ice harvesters, it was unquestionably foreseeable to Dunham–Bush that an end-user of its compressors would need the compressors to work in the ice harvesters. Thus, Metro's expenditures on the ice harvesters and the associated, specially designed equipment necessary to operation of the thermal energy storage system are damages that Dunham–Bush should have foreseen would result from its misrepresentations.[53]

53. Dunham–Bush cannot credibly argue that it was unaware of the significance of its compressors in the ice harvesters in which the compressors were used. Even though Dunham–Bush did not market its compressors directly to Metro, a preponderance of the evidence establishes that Dunham–Bush knew that end-users would construct extensive mechanical systems to serve large institutions. The Court holds that Metro has proven that recovery of the cost of the equipment necessary to the operation of the ice harvesters specifically is justified.

Because Metro's equipment was specially designed around the Dunham–Bush compressors

■ However, Dunham–Bush contends that Metro's damage model is excessive since it was not reasonable for Metro to abandon its thermal energy storage system completely and thus it was not foreseeable that Metro would attempt to hold Dunham–Bush liable for Metro's entire investment (including costs to correct others' engineering errors) simply because Dunham–Bush's compressors failed to perform at their represented reliability. The Court agrees that Dunham–Bush should not be held liable for expenses incurred entirely as a result of others' errors. Also, it was not reasonable, and thus was not foreseeable, that Metro would abandon the entire thermal energy system after it experienced difficulties with Dunham–Bush's compressors. Thus, the Court declines to award Metro the entire $2 million that it seeks in damages from construction, maintenance, disassembly, and demolition of the thermal energy storage system.

The Court finds instead that the foreseeable expenditures include $433,500 Metro paid for its first three ice harvesters it purchased in 1990, as well as closely associated specially designed equipment, including particular tanks, piping, engineering, and controls. The Court concludes that Metro's reliance damages are $744,800.00, its expenditures directly attributable to the first three ice harvesters and all specially configured or designed associated equipment. This sum is reflected in a January 28, 1992, cost analysis performed by Hays for Metro while Metro was assessing its actual ice harvester and thermal energy storage system costs and the payback schedule for the thermal energy storage system.[54]

and Morris ice harvesters, the Court finds that it was foreseeable that Metro would not be able to use this equipment with replacement compressors manufactured by any other company. Thus, it was foreseeable to Dunham–Bush that if its compressors did not function properly, Metro's investment in this surrounding equipment would be lost.

54. *See* PX 285. Analyses by Metro in July and August 1990 in making the selection of the ice harvester over alternative equipment supplied by other vendors (DX 117, 123, 130) reflected somewhat higher anticipated costs for the same equipment and associated items (in the $800,000 to

In addition, Metro has demonstrated by a preponderance of the evidence that the $57,-488.20 it spent to expand its thermal energy storage system by purchasing and building two additional ice harvesters in 1992 was a consequential damage attributable in material part to the false assurances given by Dunham–Bush in July and August 1991 (and earlier) that the compressor failure Metro had experienced was random and non-reoccurring in nature. Thus, the Court finds and concludes that the damages suffered by Metro in reliance on and as a foreseeable consequence of the misrepresentations of Dunham–Bush total $802,288.20.[55]

### b. *Mitigation*

■ As described earlier, Dunham–Bush argues that Metro failed to mitigate its damages by substituting another company's compressors into its ice harvester and instead abandoning its thermal energy storage system entirely. Dunham–Bush has the burden of proving that Metro failed to mitigate to the extent of the damages the Court finds appropriate to award. *See Austin Hill*

*Country Realty, Inc. v. Palisades Plaza, Inc.*, 948 S.W.2d 293, 299 (Tex.1997) ("breaching party must show that the non-breaching party could have reduced its damages").

■ Dunham–Bush contends that further redesign of the ice harvesters or possibly substitution of a different compressor in and some redesign of the ice harvester would have cured the problems Metro experienced.[56] The Court is unpersuaded by this argument. No expert could point to any working example of the equipment that Dunham–Bush claims Metro could have used. The parties and Morris, in consultation with various experts, spent several years progressively altering the design of the compressors and the ice harvesters. That amount of time was more than enough for Metro to wait for the problems to be solved.[57] The Court finds Dunham–Bush's argument regarding what further adjustments could have been made to the ice harvesters to be nothing more than gerry-rigging, with no probative evidence of a likelihood of success. Indeed, Dunham–

"[w]hile 'damages may not be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.' " *DSC Communications Corp. v. Next Level Communications*, 107 F.3d 322, 330 (5th Cir.1997) (quoting *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 24 (5th Cir.1974)).

$900,000 range), but these earlier estimates appear to have overstated the actual cost of the ice harvesters and associated taxes. These documents demonstrate that other vendors' competing chiller equipment was materially different in size or design from those for the ice harvesters, although the total costs were approximately the same.

55. The Court has determined also that it is inappropriate to credit against this sum the $88,550 Metro retained of the HL & P incentive payment. The Court does not award Metro its full expenses for the thermal energy storage system. Rather, the Court concludes that reliance damages awarded presume Metro would have continued to maintain its system. Thus, no credit is warranted.

The Court has arrived at this damage total after detailed consideration of the parties' multitudinous exhibits. The Court found it necessary to perform its own analysis because neither party advanced an acceptable theory for assessing a reasonable and foreseeable recovery. As the finder of fact in this case, the Court has discretion to determine, within the legal framework described in this opinion, what amount of damages it is persuaded were actually proven. Although the Court's calculations required some judgment calls regarding what expenses were closely enough related to the ice harvesters and associated equipment, the Court believes that its result is supported by the weight of the evidence. As the Fifth Circuit has recently explained,

56. Dunham–Bush characterizes this argument as a failure on Metro's part not only to mitigate its damages, but also to obtain "cover" (or substitute goods) for the defective compressors. However, § 2.712(c) of the Tex. Bus. & Com.Code expressly provides that recovery of the cost of cover is merely one remedy for breach of contract and that a buyer's failure to effect cover does not bar it from other remedies. Thus, the Court rejects Dunham–Bush's apparent argument that Metro may not recover damages on its warranty claim because it failed to obtain "cover" for the defective compressors.

57. Dunham–Bush's own engineers' testimony established that the basic problem causing compressor malfunctions was the widely fluctuating internal pressures (and possibly variable temperatures) in the ice harvesters. These conditions were inherent in the ice harvesters and could not be expected to be corrected through the changes to the system suggested by Dunham–Bush's experts.

Bush's experts' estimates of costs of their proposed alterations to the ice harvesters were unconvincing at best; in large part these "guesstimates" were unsupported by documentation and, the Court concludes based on the witnesses' demeanor, were merely pure speculation.[58]

It was not necessary or reasonable under all the attendant circumstances for Metro to attempt to accommodate the foibles of the Dunham–Bush compressors. Because Dunham–Bush's compressors were purportedly "specially designed" for the Morris ice harvesters, and the ice harvesters were sold as a package with the Dunham–Bush compressors, Metro was not required under the guise of mitigation to experiment by starting an engineering project from scratch in order to utilize another manufacturer's compressor or redesign the ice harvesters. Although an injured party is required to use reasonable diligence to minimize its losses, it is not required to "make unreasonable personal outlays of money or to sacrifice a substantial right of [its] own." *Bank One, Texas, N.A. v. Taylor*, 970 F.2d 16, 29 (5th Cir.1992) (citations omitted); *Texas Gas Exploration Corp. v. Broughton Offshore Ltd. II*, 790 S.W.2d 781, 789 (Tex.App.—Houston [14th Dist.] 1990, no writ). Instead, an injured party is required to incur "only slight expense and reasonable effort" in mitigating its damages. *Bank One*, 970 F.2d at 29.

Thus, the Court concludes that Dunham–Bush failed to meet its burden of proving that Metro failed to mitigate its damages with respect to the ice harvesters and specifically associated equipment and costs.

### c. Punitive Damages

Plaintiff contends that the Court should find that Dunham–Bush acted intentionally or with conscious indifference or malice towards Metro and accordingly should award punitive damages in this case. After considering the demeanor and credibility of the witnesses responsible for the compressors' design, the marketing by Dunham–Bush, and the representations as a whole, the Court is left unpersuaded that Dunham–Bush acted with malice. The Court also finds the damages awarded as compensation are sufficient; punishment against Dunham–Bush is unnecessary. The Court therefore declines to award punitive damages in this case.

### 2. Breach of Warranty Damages

As described earlier, Dunham–Bush breached its express five year "parts and labor" warranty in December 1992 when it refused Metro's request to replace the three failed compressors. Under this warranty, Metro would be entitled merely to replacement of the compressors that had failed. However, because Dunham–Bush did not effectively limit its express warranty or disclaim implied warranties and because Dunham–Bush's refusal to honor its replacement warranty to Metro caused a failure of essential purpose of that warranty, Metro is entitled to damages arising from Dunham–Bush's breach of its express warranty regarding capacity, suitability, and reliability and implied warranty of fitness for a particular purpose.

### a. Actual Damages

■ When a buyer proves liability for breach of contract or warranty[59] in regard to accepted goods, it is entitled to recover "damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach *as determined in any manner which is reasonable*." Tex. Bus. & Com.Code § 2.714(a) (emphasis added). Although the ordinary remedy for the loss is expectation damages,[60] § 2.714(b) expressly notes that this measure is not ap-

---

**58.** The Court recognizes the substantial expertise of Dunham–Bush's experts. However, having considered the demeanor and tone of voice of these experts, and the contrary opinions of Metro's experts, the Court remains unpersuaded of the efficacy of the solutions Dunham–Bush proposed.

**59.** Breach of warranty is governed by the same rules which govern actions for breach of con-

tract. *See Keith v. Stoelting, Inc.*, 915 F.2d 996, 999 (5th Cir.1990) (citing *Boelens v. Redman Homes, Inc.*, 748 F.2d 1058 (5th Cir.1984)).

**60.** Expectation damages are defined as "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted." Tex. Bus. & Com.Code § 2.714(b).

plicable if "special circumstances show proximate damages of a different amount." In this case, there are two many unknown factors for the Court to calculate expectation damages with any reasonable certainty. *See City of Dallas v. Villages of Forest Hills, L.P.*, 931 S.W.2d 601, 605 (Tex.App.—Dallas 1996, no writ) (damages are not recoverable if they are "remote, contingent, speculative, or conjectural").[61] Rather than speculate on the appropriate amount of expectation damages, the Court finds that the circumstances of this case require a measure of recovery based on the foreseeable amount Metro expended in reasonable reliance on Dunham–Bush's breached warranties.[62]

■■■■■ Thus, the Court concludes that Metro is entitled to the same measure of damages on both its fraud and warranty causes of action.[63] However, even though Metro has brought claims based on two different legal theories, Metro may only obtain a single recovery for Dunham–Bush's wrongdoing. *See Quest Medical, Inc. v. Apprill*, 90 F.3d 1080, 1085 n. 5 (5th Cir.1996); *Birchfield v. Texarkana Mem. Hosp.*, 747 S.W.2d 361, 367 (Tex.1987) (party that seeks redress

under two or more theories of recovery for a single wrong is entitled to only one remedy). Under Texas law, if the prevailing party has not specifically elected which cause of action it would like to serve as the basis for its recovery, the court should award damages on the cause of action that would provide the greatest relief, including consideration of attorneys' fees. *See Purina Mills, Inc. v. Odell*, 948 S.W.2d 927, 940 (Tex.App.—Texarkana, 1997); *Town East Ford Sales, Inc. v. Gray*, 730 S.W.2d 796, 812 (Tex.App.—Dallas 1987, no writ). Since the only remedial difference between Metro's two theories of recovery is that Metro's warranty claim entitles it to attorneys' fees, *see infra*, the Court enters judgment on Metro's warranty claim.

### b. *Attorneys' Fees*

Metro seeks recovery of attorneys' fees and expenses incurred in this suit and in an earlier action it brought against Morris. Since Metro has succeeded in proving that Dunham–Bush breached its warranty to Metro, Metro is entitled to attorneys' fees and expenses incurred in connection with its prosecution of *this* suit.[64]

---

**61.** Since the breach of warranty is Dunham–Bush's provision to Metro of defectively designed compressors as well as the independent breach of failure to honor the replacement obligation when requested, expectation damages in this case would require determinations of what Metro would have spent on the thermal energy storage system absent the compressor failures and a determination of what Metro could have saved if it had been able to load-shift as planned. It also would be necessary to determine whether the ice harvester-based thermal energy storage system could have operated with one, two, or three units out of order at any given time after Metro expanded its facility as it had planned. One also would need to predict when and how often the compressors in the five ice harvesters would have failed or whether Dunham–Bush would have continued to replace the compressors. The parties would have to supply information on the HL & P discounts available given applicable variables. Since the evidence is uncontroverted that some compressors worked for merely days before failing, while others worked for years, it is impossible to predict what the performance of the compressors in Metro's facility would have been. Moreover, since Dunham–Bush had at most only one compressor in stock of each model sold by Morris and Metro alone had five of the 1216SEs in its facility, it is far from certain that any replacement compressor would have been available in a timely manner.

**62.** In addition, the Court finds reliance damages to be an appropriate measure of recovery since Metro has expressly waived its right to recover expectation damages and instead seeks damages measured by its reasonable reliance on Dunham–Bush's warranties.

**63.** Metro is entitled to incidental and consequential damages under its warranty claim as well as under its fraud claim. *See* Tex. Bus. & Com. Code §§ 2.714(c) and 2.715. In addition, Metro has cited a number of Texas cases that have allowed breach of warranty recovery for similar expenditures, such as installation costs, which the Court has found appropriate under Metro's fraud claim. *See, e.g., Kold–Serve Corp. v. Ward*, 736 S.W.2d 750, 755 (Tex.App.—Corpus Christi 1987, writ dism'd by agr.); *Brandtjen & Kluge, Inc. v. Tarter*, 236 S.W.2d 550, 554 (Tex.Civ. App.—Fort Worth 1951, writ ref'd n.r.e.).

**64.** *See* PX 403, 473. The Court declines to award the *Morris* suit fees, which total $264,660. Fees expended in the *Morris* suit are properly allocable against recovery from Morris, if recoverable at all. There is no basis to charge Dunham–Bush with this sum. On the other hand, the Court rejects Dunham–Bush's contentions that it is entitled to credit in this case for fees incurred by Metro that benefitted it in the Morris case, or that Metro's counsel somehow spent

Under § 38.001(8) of the Texas Civil Practice and Remedies Code, a prevailing party is entitled to "reasonable attorney's fees" for prosecuting a successful breach of contract claim. *See Marre v. United States*, 117 F.3d 297, 309 (5th Cir.1997) (trial court has no discretion to deny fees if they are proper under § 38.001). The trial court, when acting as the factfinder, has discretion to fix the amount of reasonable fees. *See id.; Oake v. Collin County*, 692 S.W.2d 454, 455 (Tex.1985) (determination of fees is fact issue and court's finding will not be disturbed absent an abuse of discretion). In deciding what amount is reasonable, the court can consider the nature and complexity of the case, the amount of time and effort required, the expertise of counsel, and the court's own expertise. *See Thomas v. Thomas*, 917 S.W.2d 425, 436–37 (Tex.App.—Waco 1996, no writ); *Murrco Agency, Inc. v. Ryan*, 800 S.W.2d 600, 606–07 (Tex.App.—Dallas 1990, no writ). In addition, the award of attorneys' fees must bear some reasonable relationship to the amount in controversy. *See Travelers Insurance Co. v. Brown*, 750 S.W.2d 916, 918–19 (Tex.App.—Amarillo 1988, writ denied).

The Court is persuaded, after a detailed review of Metro's expert's testimony regarding attorneys' fees, the exhibits on which he relied, the pleadings, all documents in the Court's file, and the other evidence of record, that, under Texas law, the evidence supports the sum Metro seeks of $337,255.74 as reasonable attorneys' fees and expenses.[65]

### 3. Effect of Metro v. Morris Settlement

As mentioned in the previous section, Metro initially sued Morris in another action. Metro brought that suit in state court, styled *Metro National Corp. v. Morris & Associates*, No. 92–58780 (61st Judicial District, Harris County), under claims of negligence, fraud, and breach of warranties involving the ice harvesters' failure, including breach of warranties involving the failures of the Dunham–Bush compressors. Metro settled that suit with Morris and dismissed its claims. Metro elected not to sue or assert any claims against Dunham–Bush in the state court proceeding.

The parties have agreed (and the Court finds it appropriate) that the proceeds Metro has received from its settlement with Morris[66] shall be credited against any right to recovery Metro obtains in this action and that Dunham–Bush shall pay only the balance.[67] The Court has considered and relied upon this fact in calculating Metro's damages in this action.[68]

---

duplicative time in this case as a result of it being prosecuted separately from the Morris action. Dunham–Bush failed to establish any facts to support these contentions. Moreover, since it will benefit from a 100% credit for monies Metro received from Morris, Dunham–Bush has benefitted to the full extent necessary from the existence of two suits.

65. Ordinarily, where a case involves more than one claim, attorneys' fees can be awarded only for necessary legal expenses incurred in connection with the claims on which the recovery of fees is based. *See Bank One*, 970 F.2d at 35; *Green International, Inc. v. Solis*, 951 S.W.2d 384, 389 (Tex.1997). An exception exists, however, when the causes of action are so intertwined as to be inseparable. *See Stewart Title Guaranty Co. v. Aiello*, 941 S.W.2d 68, 73 (Tex. 1997) (party suing for attorneys' fees may recover the entire amount covering all claims when the claims are "dependent upon the same set of facts or circumstances"). In this case, the Court finds that Metro's fraud and warranty claims, which were based largely on the same facts and which allow for the same recovery of damages, are virtually inseparable. In any event, "if no

one objects to the fact that the attorney's fees are not segregated as to specific claims, then the objection is waived." *Green International*, 951 S.W.2d at 389. Therefore, the Court will not reduce Metro's attorneys' fees to account for the fees attributable to Metro's fraud claim.

66. This settlement agreement is confidential and is filed under seal. DX 76. Therefore, the Court does not refer to the specifics of that settlement agreement.

67. Dunham–Bush continues to argue that Metro's prior suit against Morris bars its claims against Dunham–Bush in their entirety under the doctrine of claim preclusion. The Court has already ruled on the issue of claim preclusion, *see* Order, at 14–18, and now reaffirms its rejection of Dunham–Bush's argument.

68. The Court recognizes that, in addition, Morris has asserted claims against Dunham–Bush for breach of warranty, seeking to recover from Dunham–Bush all monies Morris paid in settlement to Metro. That suit is pending as *Morris & Associates, Inc. v. Dunham–Bush Corporation*,

#### 4. *Prejudgment Interest*

 Plaintiff is entitled to recover prejudgment interest at the rate of 10% per annum compounded annually, pursuant to Tex.Rev.Civ. Stat. Ann. art. 5069–1.05 § 2 (West.Supp.1997).[69] Equitable prejudgment interest in a breach of contract case accrues from the date of injury to the date of judgment. *See Graco Robotics, Inc. v. Oaklawn Bank,* 914 S.W.2d 633, 646 (Tex.App.—Texarkana 1995, no writ); *CKB & Assocs. v. Moore McCormack Petroleum, Inc.,* 809 S.W.2d 577, 587 (Tex.App.—Dallas 1991, writ denied). In this case, there are a variety of possible dates of injury. Arguably, Metro's injury occurred when it received its first order of ice harvesters containing unsuitable compressors; when it experienced its first compressor failure; when it was unable to obtain replacement compressors; or when it shut down its thermal energy storage system. The Court concludes that the appropriate injury date by which to measure the accrual of prejudgment interest is the date on which it was clear that Metro was unable to obtain replacement compressors and determined to operate a chilling system without use of the ice harvesters, March 31, 1993. This is the latest and Hays' most conservative date, and the Court deems it fair in light of the damages awarded.[70]

Prejudgment interest accrues only on the actual damages awarded in this case and not on attorneys' fees. *See Fuchs v. Lifetime Doors, Inc.,* 939 F.2d 1275, 1280 (5th Cir. 1991). Interest is payable on the damage

award prior to the *Morris* suit settlement offset.

### III. *CONCLUSION*

It is therefore

**ORDERED** that Plaintiff Metro shall have judgment against Defendant Dunham–Bush in the amount of $802,288.20, plus prejudgment interest of $418,039.89 (interest from March 31, 1993), for a total of $1,220,328.09, less the credit to which Dunham–Bush is entitled as an offset for monies received by Metro as a result of its settlement in *Metro National Co. v. Morris,* No. 92–58780 (61st Judicial District, Harris County). It is further

**ORDERED** that Defendant Dunham–Bush shall pay Plaintiff Metro's attorneys' fees in the amount of $337,255.74. It is further

**ORDERED** that, pursuant to 28 U.S.C. §§ 1920, 1924, Defendant Dunham–Bush shall bear Plaintiff Metro's court costs incurred in prosecuting this action.

---

Civ. Action No. 96 CV 916 (S.D.Tex.(Houston.Div.)). From this Court's standpoint, that lawsuit has no bearing on the current case.

**69.** The Fifth Circuit has explained that when a party recovers damages for breach of a contract and, as here, the contract "does not unambiguously [ ] establish the amount owed," then the equitable prejudgment interest rate described in article 5069–1.05 applies. *Quest Medical,* 90 F.3d at 1095 (internal quotations omitted).

**70.** This date is appropriate, further, because, although the Court will enter judgment in favor of Metro on its fraud and breach of warranty claims, damages are awarded on the warranty

claim only, since attorneys' fees and expenses are recoverable under that claim. The warranties which the Court concludes provide the bases for Metro's recovery are the express warranty of suitability and reliability and the implied warranty of fitness for a particular purpose. These warranties were clearly operative when Dunham–Bush's express five year "parts and labor" warranty failed of its essential purpose. As described earlier, the Court finds that this limited warranty failed of its essential purpose in March 1993, the time by which it was clear Metro was unable to obtain replacement compressors. Thus, the Court awards prejudgment interest for the period from March 31, 1993, to the date of judgment.